UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DAVID WINDOM,

      Plaintiff,

v.                                             Case No. 6:23-cv-761-JA-UAM

ORANGE COUNTY,

      Defendant.

## ORDER

THIS CAUSE is before the Court on Defendant Orange County's Motion for Summary Judgment ("Motion for Summary Judgment," Doc. 31). Plaintiff filed a Response in Opposition to the Motion for Summary Judgment ("Response," Doc. 32), and Defendant filed a Reply to the Response ("Reply," Doc. 34). For the following reasons, Defendant's Motion for Summary Judgment (Doc. 31) will be granted.

### I. Factual Background

Plaintiff David Windom sued Defendant Orange County for deliberate indifference to his serious medical need while he was detained in the Orange County Jail ("OCJ") in violation of the Eighth and Fourteenth Amendments.[1]

---

[1] The Court previously dismissed Plaintiff's claim for negligent supervision. *See* Doc. 25.

(Doc. 31-1 at 3-4.) Plaintiff alleged that to save money Defendant "has internal policies and procedures that dissuade their medical staff from referring matters to outside medical providers." (*Id.* at 2.)

The parties submitted the following evidence. In 2018, Plaintiff was arrested and incarcerated in the OCJ until his release in May 2019. (Doc. 32-5 at 1.) While in OCJ, Plaintiff began experiencing irritation, redness, and blurriness in his right eye. (Doc. Nos. 31-1 at 2; 31-3 at 11.) Before this time, he had no conditions impairing his vision. (Doc. 32-5 at 2.)

Pursuant to Defendant's protocol, Plaintiff was seen by OCJ's medical staff several times. They treated Plaintiff's eye condition with over-the-counter eyedrops, which seemed to aggravate his condition. (Doc. Nos. 31-1 at 2; 31-3 at 11-12; 32-5 at 3.) Plaintiff requested to be referred out to a vision specialist many times, but his requests were denied. (Doc. Nos. 31-1 at 2; 32-5 at 3.) Plaintiff's vision problems became progressively worse, and after two to four months, he was sent to Bird Institute/Garay Eye Care and Surgery Center. (Doc. Nos. 31-1 at 2; 31-3 at 12, 15; 32-5 at 3.)

On February 25, 2019, Dr. Cynthia Franco first examined Plaintiff, who complained of a burning sensation and foggy vision in his right eye. (Doc. 31-2 at 5.) Dr. Franco determined that Plaintiff had uveitis[2] and prescribed him

---

[2] Dr. Franco testified that uveitis is "a condition where the front part of the eye is inflamed[,]" which can be caused by, among other things, trauma, herpes, or

2

Prednisolone Acetate 1% ("Prednisolone") drops to be taken every two hours. (Doc. Nos. 31-2 at 5; 31-4 at 6.; 32-5 at 3.)

Dr. Franco next saw Plaintiff on March 13, 2019. Dr. Franco's examination record indicated that Plaintiff told her he used the medication for a week and then discontinued it, but Plaintiff attests that OCJ failed to provide him with the medication. (Doc. Nos. 31-2 at 7, 11; 31-4 at 7; 32-5 at 4.) Dr. Franco prescribed Plaintiff Timolol .5% ("Timolol") and Prednisolone drops to be used four times daily for two weeks, and she requested that Plaintiff be allowed to keep the drops with him. (Doc. Nos. 31-2 at 8; 31-4 at 8.)

When Dr. Franco next saw Plaintiff on April 18, 2019, Plaintiff told her he had not received the Prednisolone drops. (Doc. Nos. 31-2 at 10; 31-4 at 9; 32-5 at 3.) During the time Plaintiff waited for OCJ to give him the prescribed medication, his vision became worse. (Doc. 32-5 at 4.) Dr. Franco continued the two prescriptions and contacted OCJ's Medical Director to ensure that Prednisolone was put on Plaintiff's list of medications, so he would receive it. (Doc. Nos. 31-2 at 21; 31-4 at 10.)

On May 3, 2019, Dr. Bird examined Plaintiff and noted that his vision had improved. (Doc. Nos. 31-2 at 10-11; 31-4 at 11-12.) Dr. Bird continued Plaintiff's

---

rheumatoid arthritis. (Doc. 31-2 at 5-6.) Dr. Franco did not determine what caused Plaintiff's uveitis. (*Id.* at 6.) According to Dr. Franco, uveitis can increase eye pressure and too much increase in eye pressure may cause blindness. (Doc. 31-2 at 23.)

3

two prescriptions and also prescribed Valcyclovir to treat suspected herpes in his eyes. (*Id.*) On May 20, 2019, before Plaintiff's release from OCJ, Plaintiff was examined again, and Dr. Franco noted that his condition had improved and prescribed him Prednisolone and Timolol for two weeks. (Doc. Nos. 31-2 at 11; 31-4 at 13-14.)

On August 27, 2020, more than a year after Plaintiff was released from OCJ, Plaintiff returned to Garay Eye Care and Surgery Center for a disability eye examination. (Doc. Nos. 31-2 at 11-12; 31-4 at 15-17.) Dr. Franco's examination record from that date reflects that Plaintiff indicated he was not taking any medication at that time. (*Id.*) Plaintiff had no light perception or view in his right eye, and Dr. Franco concluded that he had neovascularization corneal scarring.[3] (Doc. Nos. 31-2 at 12-15, 28-29; 31-4 at 15-17.) Dr. Franco testified that untreated uveitis usually does not cause corneal scarring. (Doc. 31-2 at 14-15.) Dr. Franco believes that the neovascularization contributed to Plaintiff's lack of vision. (*Id.* at 24-25.)

On May 13, 2021, Dr. Garay examined Plaintiff and noted neovascularization corneal scarring. (Doc. 31-4 at 18-19.) Dr. Garay prescribed Plaintiff Pred Forte 1% and directed him to have a scan of his eyes. (*Id.*) On

---

[3] Dr. Franco testified that neovascularization occurs when blood vessels grow where they are not supposed to grow to try to heal that part of the body. (Doc. 31-2 at 24-25.)

4

June 1, 2021, Plaintiff had a follow-up visit with Dr. Garay. (Doc. Nos. 31-2 at 16; 31-4 at 20-21.) Dr. Garay's examination record indicates that Plaintiff did not start the prescribed eyedrops; however, Plaintiff disputes that he did not use the medication. (Doc. Nos. 31-2 at 16-17; 31-3 at 27-29; 31-4 at 20-21.)

Dr. Franco testified that at as of June 1, 2021, Plaintiff's vision could not be restored. (Doc. 31-2 at 16.) Dr. Franco also testified that she did not know whether Plaintiff's treatment at OCJ had anything to do with his vision difficulties. (*Id.* at 15.) Dr. Franco maintained that she did not recall telling Plaintiff that the problems with his right eye were related to his treatment at OCJ. (*Id.*)

## II. Standard For Summary Judgment

"Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010) (citing Fed. R. Civ. P. 56). At this stage of the proceedings, "the evidence and all reasonable inferences from that evidence are viewed in the light most favorable to the nonmovant, but those inferences are drawn 'only 'to the extent supportable by the record.'" *Id.* (quoting *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010)). The burden of establishing that there is no genuine issue of material fact lies on the moving party, and it is a stringent one. *Celotex Corp. v.*

5

*Catrett*, 477 U.S. 317, 323 (1986). "If the initial burden is met, then the nonmoving party may not rest on his pleadings, but must 'go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file', designate 'specific facts showing that there is a genuine issue for trial' in order to avoid summary judgment." *Wells v. Cramer*, 262 F. App'x 184, 186-87 (11th Cir. 2008) (quoting *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1281-82 (11th Cir. 1999)).

The nonmoving party, so long as that party has had an ample opportunity to conduct discovery, must come forward with affirmative evidence to support its claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). In other words, "[f]ollowing discovery, the plaintiff opposing summary judgment may not rely on facts in the complaint, but must raise genuine issues of material fact to counter facts supporting the defendant's claim of qualified immunity." *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (citing *Hutton v. Strickland*, 919 F.2d 1531, 1537 (11th Cir. 1990)). "Though the facts alleged in an inmate's sworn pleading are sufficient to defeat a motion for summary judgment and a separate affidavit is not necessary, mere conclusions and unsupported factual allegations are legally insufficient to defeat summary judgment." *Wells*, 262 F. App'x at 187 (citing *Sammons v. Taylor*, 967 F.2d 1533, 1544 n. 5 (11th Cir. 1992)). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could

reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

### III. Analysis

Defendant contends that it is entitled to summary judgment because Plaintiff has failed to prove that Defendant had internal policies and procedures that discouraged OCJ medical staff from referring inmates to outside providers to save money. (Doc. 31 at 4-5.) Defendant also argues that Plaintiff has not established that his treatment at OCJ or the delay in referring him to an outside provider caused or worsened his eye condition. (*Id.* at 5-6.)

To prevail on a claim of deliberate indifference to a serious medical need against a county, Plaintiff must first show that Defendant "advanced 'a *'policy or custom'* of deliberate indifference that led to the violation of [Plaintiff's] constitutional right. . . .'" *Ireland v. Prummell*, 53 F.4th 1274, 1289 (11th Cir. 2022) (emphasis in original) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Plaintiff also must demonstrate that Defendant or one of its agents acted with deliberate indifference to his serious medical need. *Id.*

""A policy is a decision that is officially adopted by the [governmental entity], or created by an official of such rank that he or she could be said to be acting on behalf of the [governmental entity]' while '[a] custom is a practice that is so settled and permanent that it takes on the force of law.'" *Id.* (quoting *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997)). "'Proof of a single

7

incident of unconstitutional activity is not sufficient to impose liability' on a governmental entity" based "on either a policy or custom 'unless the challenged policy itself is unconstitutional.'" *Id.* (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985)). "Demonstrating a policy or custom requires 'show[ing] a persistent and wide-spread practice.'" *Goebert*, 510 F.3d at 1332 (quoting *Depew v. City of St. Mary's, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986)).

To establish a constitutional claim for the denial of medical care, Plaintiff must show that the failure amounted to cruel and unusual punishment under the Eighth Amendment of the United States Constitution. To do so, he must first "set forth evidence of an objectively serious medical need. Second, [he] must prove that the prison official acted with an attitude of 'deliberate indifference' to that serious medical need." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003); *see also Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007). "Third, as with any tort claim, [he] must show that the injury was caused by the defendant's wrongful conduct." *Goebert*, 510 F.3d at 1326.

An objectively serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). To demonstrate deliberate indifference, the plaintiff must show that the defendant "acted with 'subjective recklessness as used in the criminal law,' and . . . to do

so, the plaintiff must demonstrate that the defendant actually knew that his conduct–his own acts or omissions–put the plaintiff at substantial risk of serious harm." *Wade v. McDade*, 106 F.4th 1251, 1253 (11th Cir. 2024) (internal quotation omitted). "[E]ven if the defendant 'actually knew of a substantial risk to inmate health or safety,' he cannot be found liable under the Cruel and Unusual Punishments Clause if he 'responded reasonably to th[at] risk.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 844 (1994)).

Plaintiff alleged that, to save money, Defendant "has internal policies and procedures that dissuade their medical staff from referring matters to outside medical providers." (Doc. 31-1 at 2) (emphasis added). Plaintiff, however, has provided no evidence establishing that Defendant had an officially adopted policy not to refer inmates to outside medical providers to save money.

Plaintiff contends that Defendant had an unofficial custom because the evidence demonstrates more than a single isolated incident given that OCJ medical staff did not give Plaintiff his prescribed medication on multiple occasions. (Doc. 32 at 14-15.) Plaintiff also argues that other individuals have brought deliberate indifference claims against Defendant. (*Id.* at 16-17.) He specifically cites to two cases, *Muszinski v. Orange County, Florida*, Case No. 6:03-cv-655-G_S-KRS and *Bryant v. Orange County, Fla.*, Case No. 6:17-cv-

9

1423-GAP-KRS.[4] (*Id.*)

Initially, the Court notes that Plaintiff's claim of deliberate indifference against Defendant is predicated on OCJ medical staff's alleged failure to refer Plaintiff to an outside vision expert to save money, not on OCJ medical staff's failure to give Plaintiff his prescribed medication. *See* Doc. 31-1 at 3. A plaintiff may not "'raise new claims at the summary judgment stage.'" *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1338 (11th Cir. 2024) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004)).

Nevertheless, to the extent Plaintiff attempts to show that Defendant had a custom of failing to provide prescribed medication, Plaintiff relies on his own

---

[4] Plaintiff also requests the Court to take judicial notice of all 550 and 555 nature of suit ("NOS") cases filed against Orange County, Florida, in the Middle District of Florida. (Doc. 33 at 2-3.) Litigants on summary judgment cannot shift their burden to the Court by simply referring to the potential existence of "evidence," which is not specified or addressed in their brief, with the expectation that the Court will unearth beneficial evidence. *See, e.g., United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *Carolina Acquisition, LLC v. Double Billed, LLC*, 627 F. Supp. 2d 1337 (S.D. Fla. 2009) ("Federal judges are not archaeologists. . . . We possess neither the luxury nor the inclination to sift through that mound of obfuscation in hopes of finding a genuine issue of material fact to deny summary judgment.") (citation omitted); *Lawrence v. Wal-Mart Stores, Inc.*, 236 F.Supp.2d 1314, 1322 (M.D. Fla. 2002) ("It is the obligation of the non-moving party . . . not the Court, to scour the record in search of the evidence that would defeat a motion for summary judgment[.]"). The Court will not search thousands of unidentified 555 and 550 NOS cases filed in the Middle District of Florida to try to find evidence supporting a finding that Defendant had a custom or practice of dissuading their medical staff from referring matters to outside medical providers to save money. *See* Fed. R. Evid. 201(c)(2) (indicating that a court "must take judicial notice if a party requests it *and the court is supplied with the necessary information*") (emphasis added).

experience in 2019, "which is, at most, '[p]roof of a single incident of unconstitutional activity.'" *Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1311 (11th Cir. 2011) (quoting *City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985)). "Merely citing one's own personal experience, without more, is insufficient to show a longstanding and widespread practice." *Derks v. Bassa*, No. 22-13202, 2023 WL 5664197, at *2 (11th Cir. Sept. 1, 2023).

Further, Plaintiff has failed to prove that Defendant had a longstanding and widespread practice, as evidenced by *Muszinski* and *Bryant*, of dissuading OJC medical staff from referring matters to outside medical providers to save money. In *Muszinski*, a case related to an incident at the OCJ in 2001, approximately eighteen years before Plaintiff's claim accrued, the plaintiffs alleged that Orange County had a policy of refusing to provide methadone to inmates or to otherwise permit them to receive methadone from area programs. *See* Case No. 6:03-cv-655-G_S-KRS, Doc. 1 at 12. The case settled without a verdict as to Defendant Orange County's liability.

In *Bryant*, which was based on an incident at OCJ in 2015, the plaintiffs alleged that Orange County had "an unwritten policy of allowing documentation to be minimized to twice a week unless there was a change in the patient's medical condition" and that OCJ "was medically understaffed, presumably due to budgetary concerns." Case No. 6:17-cv-1423-GAP-LHP, Doc. 56 at 4. The district court dismissed the claim against Orange County because the plaintiffs

11

failed to "plausibly allege a widespread pattern of deliberate indifference that was ongoing at the time of the Decedent's death." *Id.*

Neither *Muszinski* nor *Bryant* proceeded to a verdict. Moreover, both cases were years before the incidents forming the basis of Plaintiff's claim against Defendant. In addition, these cases did not involve the same issue alleged by Plaintiff, *i.e.,* that Defendant was deliberately indifferent to Plaintiff's serious medical need because it had internal policies and procedures that dissuaded OCJ medical staff from referring matters to outside medical providers to save money. In sum, these cases do not show that Defendant had a persistent and wide-spread practice of deliberate indifference ongoing at the time of Plaintiff's treatment. Therefore, Defendant is entitled to summary judgment.[5]

## IV. Conclusion

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant Orange County's Motion for Summary Judgment (Doc. 31) is **GRANTED**.

---

[5] Plaintiff also has not presented medical evidence showing that his vision loss was caused by Defendant's alleged wrongful conduct. Dr. Franco testified that she did not know whether Plaintiff's treatment at OCJ had anything to do with his vision difficulties. (Doc. 31-2 at 15.)

2. The Clerk of Court is directed to enter judgment in favor of Defendant Orange County and close this case.

**DONE** and **ORDERED** in Orlando, Florida, on February 10th, 2025.

```
                              JOHN ANTOON II
                          United States District Judge
```

Copies furnished to:
Counsel of Record